MEMORANDUM OF DECISION
CT Page 12279
On March 17, 1999, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of the parents of Shanice P. Shanice's mother consented to termination. Donald B., Shanice's father, did not. Since B. was then incarcerated and indigent, the court appointed counsel to represent him. On January 21, 2000, after a trial, the court (Schuman, J.) granted the petition and terminated Donald B. parental rights based on his abandonment of Shanice and the lack of any ongoing parent-child relationship. The court further found that it was in the best interests of Shanice that her father's parental rights be terminated. Donald B. (hereinafter the petitioner) has appealed that judgment to the Appellate Court. On July 21, 2000, he filed a petition for a new trial based on ineffective assistance of counsel. That petition was tried before this court and is the subject of these proceedings.
 I
Preliminarily, this court examines whether a claim of ineffective assistance of counsel arising out of the termination of parental rights may be raised in a petition for new trial, pursuant to General Statutes § 52-270.[2] This issue has not been decided by our appellate courts and is not addressed by the parties.
Claims of ineffective assistance of counsel arising out of ordinary civil actions are generally unavailing since "`[e]quity will not relieve against the operation judgments rendered through the negligence or inattention of the party claiming to be aggrieved or his attorney.'"Palverari v. Finta, 129 Conn. 38, 43, 26 A.2d 229 (1942), quoting Jarvisv. Martin, 77 Conn. 19, 21, 58 A. 15 (1904). Although a petition to terminate parental rights is a "civil action"; In re Baby Girl B,224 Conn. 263, 284-87, 618 A.2d 1 (1992); it stands on different footing than an ordinary civil action because, by definition, it involves the termination by the state of a fundamental personal right. General Statutes § 45a-707(8) "defines the termination of parental rights as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his or her parent. It is, accordingly, a most serious and sensitive judicial action. . . . Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. . . ." In re BabyGirl B., 224 Conn. 263, 279, 618 A.2d 1 (1992).
CT Page 12280 "In Connecticut, a parent who faces the termination of his or her parental rights is entitled, by statute, to the assistance of counsel. General Statutes § 45a-717(b). `Because of the substantial interests involved, a parent in a termination of parental rights hearing has the right not only to counsel but to the effective assistance of counsel.'State v. Anonymous, 179 Conn. 155, 160, 425 A.2d 939 (1979)." (Footnote omitted.) In re Alexander V., 223 Conn. 557, 569, 613 A.2d 780 (1992). "It would be absurd to have the right to appointed counsel who is not required to be competent. . . . [W]hen counsel is so appointed he must be effective and competent. Otherwise, the appointment is a useless formality. . . . Indeed, [§ 45a-717(b)] would become an empty shell if it did not embrace the right to have the assistance of a competent attorney." Lozada v. Warden, 223 Conn. 834, 838-39, 613 A.2d 818 (1992).
As our appellate courts have repeatedly observed, claims of ineffective assistance of counsel when raised in direct appeals, whether from criminal convictions or from the termination of parental rights, inexorably suffer from the same deficiency, an inadequate record on which the reviewing court may determine the issue. In re Alexander V., supra,223 Conn. 569-71; In re Michael L., 56 Conn. App. 688, 700, 745 A.2d 847
(2000); In re Amanda A., 58 Conn. App. 451, 461, 755 A.2d 243 (2000); see also State v. Leecan, 198 Conn. 517, 541-42, 504 A.2d 480, cert. denied,476 U.S. 1184, 106 S.Ct. 2922, 91 L.Ed.2d 550 (1986). For this reason, in criminal appeals, "[o]ur Supreme Court has consistently concluded that the preferred vehicle for an ineffective assistance of counsel claim is either a petition for writ of habeas corpus or a petition for a new trial, not a direct appeal." State v. Patrick, 42 Conn. App. 640,650-51, 681 A.2d 380 (1996). Earlier this year, the Appellate Court held that such a claim in a termination of parental rights proceeding is best brought in "an adversarial hearing allowing for cross-examination similar to that of a habeas corpus proceeding." In re Amanda A., supra,58 Conn. App. 461. A petition for a new trial provides for such a hearing; Miner v. Miner, 137 Conn. 642, 645, 80 A.2d 512 (1951). Moreover, General Statutes § 45a-719 expressly contemplates the filing of such a petition as a means of setting aside a judgment terminating parental rights.[3] For these reasons, this court holds that a claim of ineffective assistance of counsel arising out of a petition for the termination of parental rights is properly raised in a petition for new trial.
 II
In a petition for a new trial, the petitioner has the burden of alleging and proving facts which would entitle him to a new trial on the grounds claimed. State v. Grimes, 154 Conn. 314, 325, 228 A.2d 141
(1966). This entails a two step analysis. First, he must prove that one CT Page 12281 or more grounds for a new trial, as recognized in the statute, exist. Second, he must prove that if these grounds are remedied, a new trial would be "likely to produce a different result. . . . This rule is necessary, for without it there might never be an end to litigation. . . . The basic question which the trial court has to decide is whether upon all the evidence an injustice had been done. In deciding this quest4n, the court has the exercise of a sound legal discretion, and its action cannot be disturbed unless this discretion has been abused." (Citations omitted.) Turner v. Scanlon, 146 Conn. 149, 163, 148 A.2d 334 (1959), quoted in Burr v. Lichtenheim, 190 Conn. 351, 355, 460 A.2d 1290 (1983). Both elements must be proved by a preponderance of evidence. Johnson v.State, 172 Conn. 16, 17, 372 A.2d 138 (1976); see Kubeck v. ForemostFoods Co., 190 Conn. 667, 669, 461 A.2d 1380 (1983). Miner v. Miner,137 Conn. 642, 644-45, 80 A.2d 512 (1951) "A petition for a new trial under § 52-270 is a proceeding essentially equitable in nature. . . . Such a petition for a new trial is addressed to the sound discretion of the . . . court and will never be granted except on substantial grounds."Black v. Universal C.I.T. Credit Corporation, 150 Conn. 188, 193,187 A.2d 243 (1962).
Where a new trial is sought in a proceeding to terminate parental rights, the legislature has decreed that the court must also consider the best interests of the child and that "no such motion or petition may be granted if a final decree of adoption has been issued prior to the filing of any such motion or petition." General Statutes § 45a-719. There is no evidence that a final decree of adoption has been issued. The issue of vest interests is addressed infra, part VI.
"In determining whether counsel has been ineffective in a termination proceeding, [our Supreme Court has] enunciated the following standard: The range of competence . . . requires not errorless counsel, and not counsel judged ineffective by hindsight, but counsel whose performance is reasonably competent, or within the range of competence displayed by lawyers with ordinary training and skill in [that particular area of the] law. . . . The respondent must prove that her attorney fell below this standard of competency and also that the lack of competency contributed to the termination of parental rights." (Internal quotation marks omitted.) In re Alexander V., 223 Conn. 557, 569-70, 613 A.2d 780
(1992). "In reviewing a claim of ineffective assistance of trial counsel, we indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; it is the petitioner's burden to overcome the presumption that his attorney's actions or inactions were not, in tact, sound trial strategy. . . . We also must make every effort to evaluate the challenged conduct from counsel's perspective at the time." Sloan v. Commissioner of Correction,57 Conn. App. 304 306-07, 748 A.2d 35 (2000). CT Page 12282
 III
The petitioner first complains that his trial attorney's representation was deficient because she "did not file a motion to challenge DCF['s] treatment plans, which denied Mr. [B.] visitation with Shanice. The lack of visitation was a substantial factor in Mr. [B's] inability to develop a parent-child relationship with Shanice."
General Statutes § 17a-15(a) provides: "The commissioner shall prepare and maintain a written plan for case, treatment and permanent placement of every child and youth under his supervision, which shall include but not be limited to a diagnosis of the problems of each child or youth, the proposed plan of treatment services and temporary placement and a goal for permanent placement of the child or youth, which may include reunification with the parent, long-term foster care, independent living, transfer of guardianship or adoption. The child's or youth's health and safety shall be the paramount concern in formulating the plan."
The month following her birth, Shanice was taken into emergency custody by DCF on May 27, 1997, pursuant to General Statutes § 17a-101g(c), (d).[4] This was followed by an order of temporary custody issued by the court the following day. The respondent was offered weekly visitation with Shanice. On June 18, 1997, Shanice's DCF social worker sent him a notice stating: "You have missed 75% of visits since placement of Shanice. Further visits will not occur until you contact me requesting visitation be re-established. Each visit will require 24 hr. telephone verification notice. This decision was decided upon [sic] following a meeting between myself and [social worker supervisor] Durga on 6/7/97." There is no evidence that the petitioner responded to this notice. The following week, on June 24, 1997 DCF sent the petitioner another notice stating that effective immediately: "Visitation will not be re-established until paternity test results are submitted to DCF and Juvenile Court. You are not to transport [Shanice's mother] to foster home, contact or visit foster home for any reason." The notice further stated that "this is a change in the Treatment Plan, you have the right to request a Treatment Plan Hearing with the Department. . . ." At this time, DCF was doubtful that the petitioner was Shanice's father.
The petitioner did not request a treatment plan hearing and have a paternity test until such a test was ordered by the court on May 28, 1998. The test results, which were filed with the court on July 3, 1998, evidenced that the probability that the petitioner was Shanice's father was greater than 99%. The petitioner claims that at some time subsequent to these test results, he requested that his attorney do what she could CT Page 12283 to enable him to visit with Shanice. His attorney advised him that he should not challenge the treatment plan because, in view of the psychological evaluation that had been performed on him, any such challenge would be unsuccessful and would be used against him in the trial to terminate his parental rights. Although the termination petition had not been filed at that time, the petitioner's attorney expected that it would be.
General Statutes § 17a-15(b) provides: "The commissioner shall at least every six months, review the plan of each child and youth under his supervision for the purpose of determining whether such plan is appropriate and make any appropriate modifications to such plan." General Statutes § 17a-15(c) provides in relevant part: "Any . . . parent . . . aggrieved by any provision of a plan prepared under subsection (a) of this section, or by the commissioner's decision upon review under subsection (b) of this section . . . or his parent or guardian aggrieved by a refusal of any other service from the commissioner to which he is entitled, shall be provided a hearing within thirty days following a written request for the same directed to the commissioner."
In a trial to the court, a petitioner asserting a claim of ineffective assistance of counsel is not necessarily required in all cases to present expert testimony in order to sustain his burden of proof. Evans v.Warden, 29 Conn. App. 274, 280-81, 613 A.2d 327 (1992). "Whether a defendant is denied his right to effective assistance of counsel is a mixed determination of law and fact that requires the application of legal principles to the historical facts of th[e] case." (Internal quotation marks omitted.) Id., 281 n. 3, quoting Cuyler v. Sullivan,446 U.S. 335, 342, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).
Considering the "historical facts of the care," the decision of the petitioner's trial attorney not to challenge the treatment plan's denial of visitation to the petitioner is, at the very least, curious. While the attorney testified that her advice was based on the fact that the petitioner's challenge would be denied, and that denial, in turn would become an historical fact in any termination of parental rights trial, the reality is that the petitioner's case was so weak that he had nothing to lose in making even a belated challenge for visitation.
However, the court need not resolve whether the petitioner's attorney's performance was deficient in this respect. Even assuming that it was, the same reason that makes his attorney's advice suspect undermines another essential part of his claim. That is, even if his trial attorney had challenged the treatment plan, the petitioner has failed to prove that such a challenge would have been successful.
CT Page 12284 This court may take judicial notice of the trial court file in the underlying termination of parental rights proceeding. In re Mark C.,28 Conn. App. 247, 253, 610 A.2d 181, cert. denied, 223 Conn. 922,614 A.2d 823 (1992). The record reflects that by the time the results of the petitioner's paternity test were available to him, DCF was aware that the petitioner had a lengthy criminal history. He had been arrested over ten times and was a convicted felon and shortly after Shanice's birth violated a court protective order. The petitioner had a history of severe domestic violence and probable drug and alcohol abuse. He had cohabited with Shanice's mother who admitted to smoking crack cocaine twice daily. He had been threatening toward DCF staff. He had not sought to establish his denied paternity and had seen Shanice only once. At the time he wanted his lawyer to seek visitation, he had been convicted of drug-related charges and was once again incarcerated.
In light of these facts, it was unlikely that DCF, or any other authority, would have altered the treatment plan to permit the petitioner visitation with Shanice without the petitioner having submitted to a psychological evaluation. Such an evaluation was performed on the petitioner by Dr. Bruce Freedman, Ph.D. on September 11, 1998. Dr. Freedman's report is Appendix A to this opinion. In light of that report, the petitioner has failed to prove that any belated request for visitation would have been granted.
Nor would the unsuccessful request for visitation have altered the trial court's finding of abandonment. This is confirmed by the fact that the court in the termination case based its finding of abandonment on the petitioner's failure to act as a father would after Shanice's first month of life and the time the petitioner received the result of the paternity test. The court recognized that after the results of the test, the petitioner's interest in Shanice re-emerged. That court found: "After the father learned the results of the test in July, 1998, the father did make some attempts to reestablish contact with his daughter. By that time, however, he had abandoned her for over a year. The father thus did not `maintain' the requisite `continuing, reasonable degree of concern' for his child."
This court finds that the petitioner has, therefore, failed to sustain his burden of proof that any lack of competency of his attorney in this respect contributed to the termination of his parental rights. In reAlexander V., supra, 223 Conn. 570; In re Amanda A., supra,58 Conn. App. 461. Therefore, the petitioner cannot prevail on this ground.
 IV
CT Page 12285 The petitioner next alleges that his attorney's performance was deficient because she "failed to present any evidence to show that Shanice's mother had told [him] he was not the father. [Petitioner] was prepared to testify to that effect, but [his attorney] did not question him about it during direct examination."
"This claim need not long detain us." State v. Famiglietti,219 Conn. 605, 615, 595 A.2d 306 (1991). It simply is not so.
At the trial of the petition to terminate the petitioner's parental rights, the following exchange occurred on direct examination, between the petitioner and his attorney:
 Q Did [Shanice's mother] tell you once and for all, that you were the father, or that you weren't the father?
A No, she never — she wasn't sure. So, when me and —
 Q Did she tell you at one time that you were, and then again that you weren't?
A Yes.
(Trial transcript, January 7, 2000, p. 12). The following exchanges also occurred on direct examination.
 Q [Shanice's mother] did eventually become pregnant with Shanice and tell us about the —
 A Well, she told me that she was pregnant, and I figured it was mine, she said it was mine at first. at's when I got the apartment. You know, I didn't want to stay at my mother's house, with her son, my son, and a baby on the way. And I worked for Kelly's Temporary Services at the time. And one of her friends came and asked me, we's (phonetic) were in the apartment, and she told me, "Donny, are you sure that's your kid?" And I said, "What do you mean by that?" So I asked [Shanice's mother]. She said, "Yeah." I said, "Why would your friend ask me, am I sure is that my kid. "And she said she didn't know. So, as time went by, we ran into a couple more friends and they questioned and I asked her again, and she said it might don't [sic] be mine, she's not really sure. . . . She's not sure it's my kid. . . . CT Page 12286
 Q Can you tell the Court, please, about visitation. Did you have visitation with Shanice?
 A Well, at the beginning, even after we moved out, you know, we both messed around with drugs. I didn't really think she was doing drugs until I caught her. And then, you know, I asked her, I said, "Well, whose baby is this, do you knew (phonetic) whose baby it is, because if it's mine, you're trying to kill it, that's wrong."
 She wouldn't come with a straight answer, she wouldn't say it wasn't mine, she wouldn't say it was mine.
(Emphasis added; trial transcript, January 7, 2000, pp. 3-4).
Elsewhere, the petitioner, who was permitted to testify in a narrative and discursive manner, testified that in 1997,
 [Shanice's mother was] saying I'm not the father. . . . I said, "I don't even know whether it's my kid or not. And you keep saying I'm going to take a test. Nobody comes and contact me at all."
 If she wanted me to take the test, she would have, like she said, she was supposed to tell [Shanice's mother]. I told her right on the phone, and [Shanice's mother] told her, that I wanted to take the test. I wanted to be sure. . . . And they wouldn't let me visit her. And they said the only way I could visit her, if I am the father.
(Trial transcript, January 7, 2000, pp. 11-12). Later on, the following exchange occurred between the petitioner and the court:
 THE COURT: . . . Why is it that you didn't take a paternity test until about May or June of 1998?
 THE WITNESS: She didn't never get in contact with me. She says she sent the thing, but nobody talked to me. When I talked to Debra Barker —
 THE COURT: First of all, "she didn't get in contact with you", who's she?
CT Page 12287 THE WITNESS: Debra Barker was supposed to get in contact with me. She told [Shanice's mother] that she would let her know when. As she testified yesterday, she said she sent a letter, I didn't get the letter. If it came to the house, I did not see it. When I talked to her on the telephone, she didn't mention it, and at the time I was upset with [Shanice's mother], from lying and she was sleeping with somebody else, and she told me it wasn't my baby and I was done with it.
(Emphasis added; Trial transcript, January 7, 2000, p. 42) Finally, on questioning by Shanice's attorney, the petitioner testified: "As far as I knew, my kid wasn't mine. . . . I just tried to just leave them both, all, everything alone, I just didn't want no more problems. She said itwasn't my kids' [sic], I was just fed up with it." (Emphasis added; id., 58)
In sum, the petitioner's attorney asked him, in a leading question, whether Shanice's mother had told him that he was not Shanice's father, and the petitioner repeatedly testified to this throughout his examination. The petitioner has failed to prove this ground of his petition.
 V
The petitioner's final claim of ineffective assistance of counsel is that his attorney "failed to consult with him about the progress of the case, the evidence that should be presented and the witnesses who should be called." The petitioner has failed to prove how this contributed to the termination of his parental rights. In re Alexander V., supra,223 Conn. 570; In re Amanda A., supra, 58 Conn. App. 461. Insofar as, as appears from his testimony, he wished to discuss DCF's disposition plan, which did not endorse the placement of Shanice with the petitioner's mother, disposition follows and cannot logically contribute to the termination of parental rights. Moreover, the petitioner's mother was permitted to intervene for the purposes of participating in the disposition.
 VI
Although the foregoing is dispositive of the petition, the court addresses the issue of best interests Pursuant to General Statutes §45a-719 in the event of further review. See e.g Arway v. Bloom,29 Conn. App. 469, 482, 615 A.2d 1075 (1992); Slez v. Oliger, Superior Court, judicial district of Fairfield, No. 321418S (Nov. 22, 1995). CT Page 12288
General Statutes § 45a-719 provides that in granting a petition for a new trial in a termination of parental rights case, the court shall consider the best interests of the child. The statute provides that "`best interest of the child' shall include, but not be limited to, a consideration of the age of the child, the nature of the relationship of the child with the "caretaker of the child, the length of time the child has been in the custody of the caretaker, the nature of the relationship of the child with the birth parent, the length of time the child has born in the custody of the birth parent, any relationship that may exist between the child and siblings or other children in the caretaker's household, and the psychological and medical needs of the child. The determination of the best interest of the child shall not be based on a consideration of the socio-economic status of the birth parent or the caretaker."
Shanice is now three and one half years of age. The trial court that heard the termination petition found, and the record in this action confirms,[5] she "is strongly attached to her foster family, with whom she has lived almost her entire life. One of the members of that family is her half-brother Dillon, whom the foster parents plan to adopt. Terminating the father's rights to Shanice would allow the foster parents to adopt Shanice and keep her together with Dillon." Memorandum of Decision, p. 110. On the other hand, Shanice has never had a relationship with the petitioner. The petitioner has a lengthy criminal history, including felony convictions. He had just been released from incarceration a few days before the trial of this petition. Commendably, during this most recent period of incarceration he undertook some initial steps to rehabilitate himself. However, as the trial court that heard the termination petition also observed, "being a good citizen outside of prison is a different undertaking. The father's track record in that regard is not good." Memorandum of Decision, p. 9. It would clearly not be in Shanice's best interests for the court to grant the petition.
The petition for a new trial is denied.
BY THE COURT
Bruce L. Levin Judge of the Superior Court
 Appendix A BRUCE FREEDMAN, PH.D. LICENSED PSYCHOLOGIST
6 Northwestern Drive, Suite 306 Bloomfield, CT 06002 PSYCHOLOGICAL EVALUATION
NAMES OF CHILDREN: Dillin P Shanice P MOTHER: Jill P FATHER: Daniel F Donald B DATE OF EVALUATION: 9-11-98
REASON FOR REFERRAL: Psychological evaluation was requested to assist in consideration of neglect petitions pending.
MATERIALS REVIEWED: Study for Extension of Commitment, Addendum to Social Study, Previous Evaluation of Jill P by this psychologist, 12-29-97
BACKGROUND: Dillin and Shanice P were placed in foster care, and later committed to the State. This action was taken based on signs of drug abuse by both parents, signs of domestic violence, and other behavior problems. Father had later been arrested and incarcerated on drug charges. Mother did not cooperate with services during the long placement, and was reported to sometimes leave the area for periods of time.
DONALD BROWN: Mr. B was 32 years old when interviewed. He was transported from his correctional facility for this evaluation. Mr. B said he was currently incarcerated for selling drugs. He said he was currently CT Page 12291 serving a five year sentence for selling drugs. He agreed that he had been incarcerated four times including the present prison term.
Mr. B said he had not grown up with his father, so that he did not know anything about his mother's claim that his father's drug use had contributed to his death five years ago. Mr. B said his mother lived in the New London area. He said he he spent two summers with his father, when he was 12 and 14. He said his father seemed okay at that time, worked, and that he got to see some of his half siblings during these visits. Mr. B said he was his mother's only child.
Mr. B said that when he was growing up, he was taken care of by his mother and stepfather, Mr. E He said that more recently, his grand mother lived with them. Mr. B said that he had been in a number of fights as a teenager for which he had been arrested, so that when he was arrested for stealing a car at age 14, he was sent to Long Lane. He said he stayed at Long Lane for 3 months.
Mr. B said he dropped out of school when he turned 16, for "no particular reason He said he was arrested for his part in a robbery at age 16, and was incarcerated as an adult He said he had not gotten involved in drugs by this time. said he had worked for different business, trying to support himself. He said he had lived with his mother and stepfather, until he was 18.
Mr. B said that age 18 he had a child with Jolanda W. He said he and Jolanda lived together from age 16 to 23. He said they got their own apartment, and that both he and Jolanda worked. He said they got tired of each other, and so Jolanda took their child and moved to North Carolina. He said that he had caught Jolanda with another guy, started fighting, and that when her shirt got ripped off, he was arrested on rape charges. He said that later on, he went to North Carolina to be with Jolanda again. He said he lived with her for about 8 months when his son was about 4, but that this did not work out.
He said he brought his son back to CT about three years ago, since Jolanda had trouble handling Donald Jr. He said he had gone to North Carolina, and brought his son back to live with him and his mother. He said that Donald lived with them and Dillin and Jill, in their apartment. He said his son did well at first, but then started getting into a lot of trouble, fighting, stealing, etc. He said that after he went to prison this last time, his mother had been unable to handle Donald Jr., and sent him back to North Carolina.
Mr. B claimed that even though he knew that Jill smoked crack and worked as a prostitute, he fell in love with her, and said that she hid CT Page 12292 her drug use and other activities. He said that after he realized Jill was prostituting, and reported this to DCF, Jill tried to get him back by claiming he was forcing her to prostitute. Mr. B said that it was true that his smoking of crack had led to his loss of both of his jobs.
Mr. B said that Jill had sex with many different people, gave him a couple of venereal diseases he had to have treated, and that he had caught her prostituting and hanging around crack houses different times. He said she used to leave the children, and that she had a long record of this before he was involved with her. Mr. B said that he no longer wanted anything to do with Jill, who would have sex with anybody and everybody, and had too many problems. He said Jill had continued to use drugs and prostitute.
Mr. B said he wanted to establish paternity and take care of his daughter now. He said he had tried everything to help Jill, even trying to get drugs and bring them home so that she would not run the streets. He said she had reduced herself to having sex with anyone who could get her drugs. He complained that he had lost his jobs because of her, and trying to keep track of her and the children. He said that on another occasion, they had an argument after Jill had stolen Donald's money.
Mr. B said he had been drinking and trying to outrun the police, and ended up in the hospital because his heartbeat was too high. He said he was later arrested for charges Jill had pressed regarding a domestic assault. He agreed that he has been arrested for tampering with a witness after calling Jill and talking to her after there was a protective order.
Mr. B said that he had four years remaining of his five year sentence. He said he hoped to care for Shaniece once he was released from prison, and hoped his mother could care for her in the mean time.
Mr B claimed that his mother had talked to DCF and appeared in court on Shanice's behalf He said that his mother wanted to take in Shanice, and had even offered to take Dillin in as well.
Mr. B said he had not obtained drug treatment before he was incarcerated, claiming that he was ineligible for treatment after he had lost his job. He complained that he had sought help for his drug problem after his criminal charges were pending and that he was not offered sufficient help. He said he had now been incarcerated for 11 months. He said he attended NA, AA, and was on a waiting list for anger management classes as well. He said he was also waiting to try to get admitted to a program called Tier Two, which offered more drug treatment.
CT Page 12293 TEST RESULTS: On the personality testing (Rorschach, Exner scoring) Mr. B showed signs of worse than average judgment, poor organization, and difficulty in considering and respecting the needs and wishes of other people.
Mr. B created a very low number of responses. This was one of a number of indications that he had trouble organizing his thoughts and activity toward achieving goals he set, and that his productivity and organized efforts were limited. He tended to react to situations with generalizations, and showed limited ability to carefully break down situations to understand and handle them effectively. Mr. B showed signs of oversimplifying his general impressions) so that he would have trouble systematically trying to set and achieve goals in his life.
Mr. B showed accuracy of his images which was well below average. Particularly when his feelings were aroused, his judgment tended to be clouded and often distorted. Mr. B showed some tendency to act impulsively, and he might have trouble expressing his feelings clearly. He showed limited emotional responsiveness to others, and this was consistent with many signs of criminal behavior, in which he had difficulty respecting the rights and feelings of others as compared to his own wishes.
Mr. B tended to fill the quiet times with monologues regarding how life and people had mistreated and misunderstood him, whether to the prison guards, myself, or anyone else who would listen. Each of his many encounters with the police was described as being a misunderstanding, and he took little responsibility for to many serious problems in his life. While he was intelligent and articulate, he also seemed very insecure, and inclined to try to manipulate, control and threaten others in order to obtain care and security for himself.
Mr. B showed many signs of a troubled life, complete with disturbed, sometimes violent relationships, and much criminal activity. He made unconvincing claims of having tried to help Jill P with her problems, and of her having dragged him down from a more stable life He seemed to make similar accusations of misbehavior regarding the mother of his older child, and had been arrested for fighting with this first female partner as well. Mr. B did not seem in any position to care for Shanice or other child. If his mother wished to care for Shanice, she would need to be evaluated on her own, since little in this evaluation would support the importance of sustaining his relationship with his child through extended family placement. If should also be noted that Ms. P's claims of Donald B trying to dominate and control her, including through violence and threats, was consistent with a long established pattern described by his mother in the past. CT Page 12294
DILLIIN P Dillin was 6 years old when seen. He said he was living with his foster mother who was nice, and who sent him with lunch today. He was transported here from school by his DCF social worker.
Dillin said he was in the second grade, and liked school. I invited him to draw a person, and he took his time approaching this task. He started his drawing out with a sun shining on top of the paper, then drew a simple male figure he said was himself. He said he was feeling happy, and that if he came to life, he would play. The figure was drawn simply but adequately for his age. It suggested a tentative self-image, although a generally happy outlook and disposition.
Dillin said that he remembered Donald B, who he called Donny. He said he didn't like Donald B, because he was beating his mom. He said he didn't actually see this, but heard her cry. Dillin said he was in his room when this happened. He said he was afraid to come out of his room. Donald said he did not recall his mother doing things she wasn't supposed to do, denied that she left the children to go out, etc.
Asked his three wishes, Dillin said he would wish for toys, clothes, and for Santa to come. He said he was with his foster mother last Christmas, and that she made a nice Christmas for him. Dillin said he did not know why he lived with his foster mother, then said it was because Big Donny was hurting mom. He said that only Big Donny was using drugs, and that he knew this because he saw him. He described Donald smoking drugs in a long white thing, when Donald thought he was asleep but he wasn't. He claimed that he had never seen his mother do this. Dillin said that Donny had always been his father, and that Mr. B was his real father.
Dillin said he used to live with his "nanny," who he said was his grandma. He said that sometimes his mother came and got him and had him stay at Big Donny's house. He said he didn't like staying there, because they moved to a different house, and and then mommy and Donny started fighting. He said Donny didn't work, and just stayed at the house. He said his mother was not working either.
Dillin said that when he grew up he wanted to be a police officer. He said he liked cops because they arrested people who did bad things. He said that if he had been a cop he would have arrested Big Donny. He said he never wanted to see Do again. He said Don was sometimes nice to him and his mom, bought him toys, bought things for mom, but did too many bad things.
Dillin said he hoped he could go back to live with his mother soon. He CT Page 12295 said his mom visited him, sometimes at the foster home, other times at DCF offices.
On the Tasks of Emotional Development, Dillin created a good set of stories which were coherent and well oriented to the pictures he viewed. His stories showed a good ability to grasp the concepts of the social and family interaction depicted.
Dillin viewed his mother and parents as providing nurturance and attention, also providing guidance and discipline. He viewed his mother as providing nurturance, and his parents as sometimes giving him the attention he wanted, other times being hard to get attention from. Dillin expressed some jealousy of his mother's attention to her baby.
Dillin seemed very concerned about good vs. bad behavior. A number of stories indicated boys who misbehaved and ended up getting in trouble. Based on his reportedly excellent adjustment and behavior in his foster home and school, these stories seemed to reflect more of age-appropriate concern with trying to be a "good boy" and his strong awareness of the consequences if he did not stay on the right track.
Dillin expressed a positive attitude toward school and learning. He seemed to get along with other children, although he expressed similar concerns about being good and getting along with other children as noted above.
In general, Dillin seemed to be an intelligent, active 6 year old boy. He had adjusted well to foster care, did well in school, and he did not identify past problems while living his mother, other than fighting between his mother and Mr. B
JILL P WITH DILLIN: Ms.P arrived promptly for this interview, visited with Dillin before and after this interview, and Dillin seemed very comfortable with her. Mother seemed calm and attentive to her son, and got on the floor to play with him.
Mother and Dillin played happily with different toys in the room. Their play we lively, and mother followed her son's lead well at times, but also participated and added her own creativity and ideas to their play. Dillin was obviously comfortable with her, and enjoyed his play with his mother."
Mother said that Dillin had seen Mr. B attack her once, but that on another occasion, he had seen mother with two black eyes and a swollen face aster another attack. Dillin nodded his head in agreement. Mother said she had been with Mr. B for about two years before that. She said CT Page 12296 she had tried to leave him repeatedly, but that he would not let her leave. She said she would hide from him, but that he would track her down and beat her up. She said he wrote her a couple of letters from jail, and that when he sent the second letter, along with the first letter her mother had returned to the jail, she took the letters to the police station as evidence of his attempts to harass and intimidate her.
Mother said that she had stopped using crack cocaine, and had continued using marijuana, but only once in a while. She said that her social worker was trying to get her into a halfway house, and that this idea was supported by her mother. She said she hoped she would be able to work nights, continuing the restaurant job she had now had worked for almost a month. She said that she had been "through a lot, I let myself go." She said she had her freedom, from being free of Mr. B and his possessive control of her. She said she was allowed to visit her children every other week.
Mother said that Shanice had tubes put in at Backus Hospital back in March, but did not stay overnight. She said she would always visit her children if they had stayed overnight at the hospital. She said that the foster mother had a car accident with Shanice, and that when Ms. P learned of this she immediately rushed to the foster home to check on her daughter. She said that she had gone to New York instead of attending her daughter's birthday party, because she was "still enjoying my freedom, hanging out with my friends."
Mother said she was not currently attending any services of any kind. She said she had turned to crack cocaine once her children were commited, since she realized that she had focused so much on Donald B that she had lost her children. As she spoke about this, she started to cry and yell that she was a good mother, who would do anything for her children. Dillin stood quietly as mother had her emotional outburst, not saying anything or flinching from the outburst, but not trying to soothe her or approach her.
Mother said that she hoped to be placed at a halfway house where she could continue working, and that later on, once she proved herself, she hoped the children could come back to live with her.
Once this discussion was over, mother settled down, and quickly returned to her interaction with Dillin. She recovered quickly and completely, and once again created an atmosphere in which he could play and have a good time. Dillin sat on her lap, snuggled with her, and played happily.
Jill said that father's son Donald Jr. used to live with them, and that CT Page 12297 father used to "beat his son like a grown man." She said she felt sorry for this boy, who was like his father, always in and out of trouble. She said they lived together in his mother's basement at first, then they had an apartment which she paid most of the expenses of. She said that Mr. B covered the small part of the expenses he was responsible by selling drugs She said he had two jobs when she first met him, but that he lost both of his jobs for using drugs and not showing up.
Jill said she was living with her mother, but was now looking for her own place, such as a small room just for her. Dillon asked his mother if she was going to look for a house for them. Mother told him that of course she would, but that it would take time for her to be able to do this.
Dillon showed signs of a solid but strained relationship with his mother He looked to her as an important but troubled person, and seemed to recognize that she had her own problems. However, the two had much affection and concern for each other and the foundation of a good relationship seemed present.
JILL P WITH SHANICE: Foster mother brought Shanice to the interview Shanice sat on her lap as mother came to get her, and did not show any response when Jill put out her arms for her. However, she did not resist as mother picked her up then brought her into the interviewing room.
Dillin was very attentive to his sister. Mother said that Shanice had limited comfort with her, since she had been taken away from her a month after birth, and mother only was able to visit her once a week since then. Mother explained that since the children were placed together, part of Shanice's comfort here might be due to Dillin's presence. I had Dillin return to the waiting area to sit with his foster mother.
Ms. P said that Mr. B had beaten her when she was pregnant with Shanice, and that based on this assault of his daughter before she was born, she did not feel he should have any visiting privileges with her.
Shanice was almost 18 months old, and she looked quiet but healthy. She was alert and looked around the room, pointing to things she saw. At times she pointed to the door, as if to reassure herself as to where foster mother was. Mother accepted this without challenging or trying to misinterpret this.
Ms. P said that she and Donald B were using drugs together, and that after a while, Mr. B used to insist that she prostitute herself in Order to finance their drug use. She said this occurred after the children were placed, and that any time she tried to refuse to go along with this, he CT Page 12298 would beat her.
Jill P had a solid visiting relationship with Shanice. Because of the child's age, length of placement, and limited visiting, Shanice's primary attachment was to her foster mother. Mother was able to hold and interact with her, and Shanice responded to her tentatively but with basic acceptance. Shanice was at an age when a secure relationship is very important to a child, so that she needed the security of her primary caretaker.
DONALD B WITH SHANICE Shanice was a shy, quiet child, and in addition she was at an age when "stranger anxiety" can reach it's peak. She showed limited comfort with mother, had never seen father during her long placement, so it was assumed that the child would be very distressed if forced to be alone with father. I had Shanice sit with her mother in the waiting area, waiting for the foster mother to return, so that she could be present in this interactional interview for the comfort of the child.
Mr. B claimed that the past few years he had developed his most serious drug problem. He minimized past drug use and drug-related charges, and tried to blame his drug use on Ms. P.
After a period of time, when foster mother did not return, I had mother try to walk Shanice into the interviewing room. When she came into the room and saw father, she had no recognition of him, and she immediately started crying loudly. I had mother walk her back to the waiting area. Father acknowledged that he had no relationship with the child. Without the presence of foster mother or other adult that Shanice felt comfortable with, it was obvious she would not tolerate being in the presence of her father or other unfamiliar adult.
Foster mother finally arrived, and agreed to come into the interviewing room. Even with her foster mother present, and sitting on her lap, Shanice pointed to the door and obviously preferred to leave. However, after a minute, Shanice calmed down and sat quietly on her foster mother's lap. Foster mother provided a few simple toys, although the child refused to take them when her father tried to hand them to her. father asked about this, and foster mother explained that Shanice did not like to take things from people she didn't know.
Foster mother explained that Shanice was playful and talkative at home, and she talked about some of the toys and activities that Shanice liked. She explained that her husband was deaf; and that Shanice expressed herself actively with her hands as a result.
Shanice gradually moved a little more, and made herself comfortable CT Page 12299 enough to play with some of the toys. She accepted some very limited contact and interaction with me, perhaps based on my presence with mother during the previous hour. Father approached her a little more vigorously, and received very little response in return. Shanice was obviously not comfortable with strangers or new people; and foster mother said this had been the case since she was very young.
 REFERRAL QUESTIONS
1. What is the present emotional and psychological status of the child?
Dillin was a 6 year old boy who had now been in placement for 16 months. He showed signs of basically healthy mental and emotional development, and he seemed to have adjusted well to his foster home and school setting. Dillin did not show signs of emotional or behavior problems. He had mostly been raised and cared for by his mother, with the presence of Mr. Donald B in his life for 1-2 years. He showed signs of basic security, a sense of independence, and other signs of generally good care through important stages of his life and development.
Shanice was an 18 month old girl who had been in foster care for almost her entire life. She was a quiet but sturdy looking toddler who showed signs of good physical, mental and social development.
2. What is the present emotional and psychological status of thebiological parents?
Donald B was the biological father of Shanice. He had tried to deny paternity at first, but a paternity test had later shown him to be the child's father. Mr. B had a long record of serious criminal behavior, including drug trafficking, robberies, and assaults. His relationships with women were disturbed, and include intimidation and violence, consistent with a report by his mother that he had always been excessively possessive of girlfriends from his adolescence. Mr. B had never shown the ability to establish an orderly, secure life, and he returned repeatedly to prison for different reasons. He had shown a pattern of substance abuse at different times in his life.
Jill P. was the biological mother of both of the children. he was previously assessed, and had acknowledged drug abuse and other serious behavior problems. Ms. P had avoided treatment, and was currently considering residence in a halfway house which would help her stay on the right track and avoid drug abuse.
3. What is the nature of the present relationship between the biological parents and the child(ren)?
CT Page 12300
Jill P had a very good relationship with Dillin, who had been in her primary care for most of his life. She had maintained this relationship through visiting with her son, although there had been lapses of visiting during the long placement. Mother had a positive, but limited relationship with Shanice, who had been in foster care for most of her life. With inconsistent weekly visits, this relationship was of limited strength.
Mr. B had no relationship with Shanice, who he had not had any visits with during her entire placement. He had denied paternity until this was proved by testing, and had been incarcerated during most of the placement period. Shanice was shy and at an age where contact with such a stranger was most unwanted. Dillin expressed negative feelings toward Mr. B, identified him as violent toward his mother, and did not want contact with this man in the future.
4. What is the nature of the marital relationship between the biological parents or between biological parent and cohabitant who will have access to the child in question and who may be called upon to exercise parenting responsibilities?
Jill in and Donald B had never been married, although they had been involved with each other for about two years. Ms. P reported that Mr. B had been controlling of her, physically intimidating and violent, and abusive in different ways. He had been arrested for his attempts to have Jill P withdraw her reports of such behavior while he was in prison. Mr. B claimed that he was instead trying to help Ms. P with drug problems, although these claims were unconvincing based on his record of relationships, his mother's description of his past problems, and even the reports of signs of violence by Dillin P.
5. How many persons and which ones provide for major child care to the child(ren)?
The two children had now been in the same foster home, together, for the past 16 months. They seemed well adjusted and secure in this home, and mother recognized and agreed with this.
6. Who are the psychological parents of the child(ren)?
Dillin regarded Jill P as his mother, and he seemed to have a sustained loyalty to her. He identified Mr. B as his father, but had a negative view of this man, and did not want to be involved with or see him again. Shanice had a positive but limited relationship with her mother, and probably had a much stronger attachment to her foster mother. Mr. B had no CT Page 12301 relationship with Shanice, since he had denied paternity at first, and had been in prison for most of the child's life.
7. Do the adult caretakers see any need for supportive services in order to address the issues which pertain to the abuse/neglect/custodial situation or the consequences of such, for the children?
Jill P in had various reasons for her complete lack of participation in services Although a number of appropriate and important services had been offered to her, she had been too distressed and defensive to take advantage of any of them. Mr. B participated in some services in prison, although the potential for these services to shorten his sentence was an obvious motivation for this participation. Mr. B took little responsibility for his past problems, blamed the mothers of his children for many of his problems, and he showed many signs of lying and misrepresenting things to make himself look better.
8. What is the nature of the extended family relationships and are extended family members likely to provide/detract from needed support?
Mr. B claimed his mother had offered her services to care for Shanice. There was no indication of this in the record, and his relationship with Shanice was not important enough to warrant consideration of changing Shanice's secure placement based on his paternity. Ms. in was currently living with her mother, although both her mother and DCF were urging mother to enter a residential program such as a halfway house.
9. Do any of the major figures involved i.e., children, siblings, and adults have any intellectual emotional, or physical characteristics which impair their ability to develop appropriate relationships, or to discharge child care responsibilities?
Mr. B showed an overwhelming criminal history which argued against his being around children. Ms. P had shown difficulty in focusing on her children and her own rehabilitation, but she still showed interest in her children and reasonably good potential for reunification in the future.
10. Of the various adults available as potential guardians/caretakers for the child(ren), with which would placement be most consistent with the child(ren)'s best interests?
Both children would need to remain committed, and in placement in their current foster home as long as possible. The children were secure in this home, and mother was able to visit on a regular basis.
CT Page 12302 11. If the child(ren) should not be allowed to live with the biological parent (with or without supervision) at the present time, when might this be possible? Suggested placements? What must occur first in the way of visitation? counseling? What kind of counseling? Other?
The plan to have mother enter a halfway house or similar program seemed to be a good step toward reunification. This would allow mother to receive support and monitoring of her progress by staff and peers, and help her maintain a focus on her children. She could benefit from personal counseling, and her counselor could provide or recommend other services as the counseling proceeded.
Mr. B had no relationship with his daughter, had denied paternity until it was proven by genetic testing, and he showed very limited potential as a custodial parent. He did not have an established relationship with the child which would warrant trying to facilitate father-daughter visiting while he was in prison. Once he was out of prison, he would hopefully be able to work and contribute to her support, and could possibly begin visiting with her at that time. Because of the lack of contact, his visiting with Shanice should be supervised through DCF once he was out of prison, or arranged outside of mother's care or home if the child had been returned to mother by that time.
12. If the child(ren) remain in the community, specific recommendations of resources for children.) or parent?
Jill P could benefit from a number of services, although she had refused any such help during the period of placement. If she entered a halfway house, this would allow her to receive support and help from peers and staff and she should also participate in personal counseling for her own benefit. If she chose not to participate in drug treatment, she should demonstrate her abstinence through periodic drug testing.
13. Is substance abuse or use any kind of a problem for any parent?
Both of the parents had shown substance abuse. Ms. P had been previously assessed by this psychologist in a psychological that took place in 12-97. Treatment recommendations were made for her at that time. Mr. B was currently incarcerated, and he seemed to be at his best in such a structured environment, where he was unable to begin his pattern of taking advantage and manipulating others for his own benefit.
Sincerely,
Bruce Freedman, Ph.D. CT Page 12303