******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE J. D.*
## (AC 47971)

Bright, C. J., and Elgo and Seeley, Js.**

*Syllabus*

The respondent mother appealed from, inter alia, the judgment of the trial court terminating her parental rights as to her minor child. The mother claimed that she did not receive the effective assistance of counsel in opposing the petition to terminate her parental rights and advocating for her motion for posttermination visitation because her counsel did not present the testimony of a psychologist who had evaluated her. *Held*:

This court concluded that the record was inadequate to review the respondent mother's claim that counsel rendered ineffective assistance by failing to call the psychologist as a witness, as the record was silent as to the testimony the psychologist would have provided at the termination trial and the mother failed to present this court with a sufficient record to overcome the strong presumption that counsel's decision not to call the psychologist to testify was strategically sound.

Argued January 16—officially released May 19, 2025***

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of New Haven, Juvenile Matters, where the respondent mother filed a motion

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

*** May 19, 2025, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

for posttermination visitation; thereafter, the case was tried to the court, *Knight, J.*; judgment terminating the respondents' parental rights and denying the respondent mother's motion for posttermination visitation, from which the respondent mother appealed to this court. *Affirmed.*

*Benjamin M. Wattenmaker*, assigned counsel, for the appellant (respondent mother).

*Lori Ann Knuth*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Nisa Khan*, assistant attorney general, for the appellee (petitioner).

*Opinion*

ELGO, J. The respondent mother, A. T., appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating her parental rights and denying her motion for posttermination visitation rights with respect to her daughter, J.[1] On appeal, the respondent claims that she did not receive effective assistance of counsel in opposing the petition to terminate her parental rights because her trial counsel did not present the testimony of Ralph Balducci, a psychologist, who had evaluated the respondent in January, 2023. We conclude that the respondent has not presented an adequate record by which we can review that claim and, accordingly, affirm the judgment of the court.[2]

---

[1] The respondent father, who participated at the termination of parental rights trial, does not challenge on appeal the termination of his parental rights. Throughout this opinion, we refer to the mother as the respondent.

Additionally, we note that, although the respondent's parental rights with regard to another child were terminated in this same trial, she does not make any claims on appeal with respect to the propriety of that determination. We note as well that a third child of the respondent was adjudicated neglected on that same date, which determination is also not the subject of this appeal.

[2] On appeal, the attorney for the minor child adopted the position of the petitioner.

The following undisputed facts, as found by the court or otherwise disclosed by the record, are relevant to this appeal. J was born in May, 2021. At that time, the Department of Children and Families (department) had been involved with the respondent's family since 2019.[3] The respondent was facing eviction and did not receive adequate prenatal care during her pregnancy with J. As a result of concerns the department had with the respondent's care of her older children, the respondent was referred to mental health therapy but inconsistently availed herself of that service and was discharged unsuccessfully. The respondent also was referred to programming to address ongoing issues with misuse of marijuana but was discharged twice due to poor attendance. On October 29, 2021, the petitioner filed a neglect petition as to J.

On March 25, 2022, J was adjudicated neglected and committed to the care of the petitioner. Citing the respondent's failure to participate in in-home visits, as well as her failure to engage with substance abuse treatment and a failure to maintain communication with the department, the court found that it was in the best interest of the child to be committed to the petitioner's custody.[4]

After the court ordered J committed to the custody of the petitioner, the respondent and J's father attempted to prevent her from being taken into care by hiding her, in what a previous court referred to as a

---

[3] At the time of J's birth, the respondent's two other children were under protective supervision, having been adjudicated neglected in 2019. These children, born to a different father than J's father, were committed to the custody of the petitioner in October, 2021.

[4] In 2015 and 2019, the department had placed the father on the Central Registry of Abuse and Neglect following its substantiation of sexual abuse of two minors. At the time of J's commitment, and throughout the events relevant to this appeal, the father was unwilling to comply with the department's requests to assess his home and for him to participate in evaluations to determine if sex offender treatment was recommended.

" 'shell game.' " The respondent claimed that J was with the father, and the father refused all attempts to communicate with him. As a result, a "silver alert" was issued through an emergency notification system to the public. See *In re Cassandra C.*, 316 Conn. 476, 490 n.5, 112 A.3d 158 (2015). Three days after the court's order, J was located at the respondent's apartment and placed in the custody of the petitioner. On April 8, 2022, the father, acting with the knowledge and support of the respondent, abducted J from foster care, and transported her to his sister's home. The father's sister notified the police, and J was returned to the care of the petitioner the following day.

On July 7, 2022, both the father and the respondent were arrested and charged with the crimes of risk of injury to a child and interfering with an officer after an incident in which the father refused to return his seven year old daughter from a different relationship to that child's mother following a weekend visit. Pursuant to a court order, police officers arrived at the respondent's apartment to retrieve the child. The respondent refused to grant the officers entry to her home. Upon forcing entry into the respondent's residence, and despite the respondent's insistence that the father was not present, police officers located the father hiding with the child in a stairwell of the residence.

On September 21, 2022, updated specific steps were ordered for each parent with regard to J. These specific steps required the respondent, inter alia, to sign releases so that the department could receive updates regarding her treatment, to participate in parenting education and supervised visitation, and to prohibit the father from residing in her home without department approval. At the request of the court, Balducci evaluated the respondent and produced a report detailing his findings in

January, 2023.[5] Balducci concluded that it would be "detrimental" to the children for visitation with the respondent to be reduced or eliminated, as the children "appear bonded" with the respondent and it would be "confusing and represent a significant loss to the children to have their contact with [the respondent] reduced or discontinued."[6] Balducci also determined that "[r]eunification appears possible" given the circumstances, but that "[i]t remains uncertain what role [the father] will play in his children's lives and as a support, or detriment, to [the respondent] given that [the father] did not participate in these [c]ourt-ordered evaluations."

Throughout the events leading up to the termination trial, and despite the full no-contact protective order, the court found that the respondent "was observed in the father's company multiple times." As the court noted in its memorandum of decision, on April 12, 2023, "the father went to a multifamily dwelling in Bridgeport where the [respondent] and the father's sister were living in separate apartments. The father broke down the door to the [respondent's] first floor apartment in an attempt to locate her, while the [respondent] attempted to escape by running up to the father's sister's apartment where the sister and eight children were present. The father kicked in the door to the sister's apartment, brandished a gun, and began arguing with the [respondent] over the location of a gaming console. Police were called to the scene and soon recovered a

---

[5] The January, 2023 report was attached to the respondent's appellate brief. Additionally, we note that Balducci previously had evaluated the respondent in February, 2020, but the 2020 report is not contained in the record.

[6] Due to the fact that the father did not appear for the court-ordered evaluation, Balducci noted that he had insufficient and limited information from which to render an opinion as to whether the father should undergo a sexual offender evaluation or otherwise receive treatment for "problem sexualized behavior."

'ghost' gun[7] and another fully loaded firearm in a vehicle the parents shared. Subsequently, the father was charged with eight counts of risk of injury, violation of a protective order, various firearms violations, disorderly conduct, and criminal mischief. Following his arrest, full no-contact protective orders issued, with the father as the subject and the [respondent] and the father's sister as the protected parties. The [respondent] denied being assaulted despite the father's sister's claim that the father had indeed assaulted the [respondent]. Notably, several months later during a court-ordered evaluation in February, 2024, the [respondent] provided . . . an account of the incident totally at odds with the police report." (Footnote in original.)

Further, "[o]n April 24, 2023, the father's sister called the police to report that the father was in the [respondent's] home. The department went to the home accompanied by a Bridgeport police officer, but the [respondent] refused to let them in to search for the father. Two days later, a department employee saw the [respondent] and the father together at a New Haven courthouse where the father had a scheduled court hearing." Additionally, "on June 19, 2023, the father's sister reported that the father and the [respondent] drove to her home and threatened and harassed her. When the father's sister approached the father, who was seated in the back seat of the car, he rolled down the window, knocked a phone she was using to record the incident from her hand, and punched her in the face. She stated he then got out of the car, brandished a gun, and threatened that he would return to shoot up the house. The [respondent] was also in the car goading another individual to fight the father's niece. The father was eventually arrested for this conduct and charged with two

---

[7] "Ghost guns are guns that have no serial numbers and are usually made by piecing together firearm components in a do-it-yourself manner. When assembled, they operate as fully functioning firearms that are largely untraceable."

counts of violating a protective order, assault in the third degree, threatening with a firearm, and breach of the peace."[8]

In August, 2023, department social worker Christopher Traylor prepared a social study in support of the termination petition. Traylor's report noted that the respondent had been compliant with providing releases for all her providers. The report, nonetheless, noted that "mental health, intimate partner violence and the lack of safe housing" were ongoing issues "due to [the father] having consistent access to her home as there have been multiple reports of [the respondent] being seen with [the father]." Noting the substantiation of sexual violence by the father, Traylor concluded that the respondent "fails to comprehend how allowing [the father] access to her home and children puts them at risk for safety."

On September 6, 2023, the petitioner filed a petition seeking to terminate the respondent's parental rights with respect to J. The petition alleged that the department had made reasonable efforts to locate the parents and reasonable efforts to reunify J with her parents. The petitioner further alleged that grounds existed for termination of parental rights because the child had been found in a previous proceeding to have been neglected, abused, or uncared for and both parents had failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of J, the parents could assume a responsible position in her life.

On January 31, 2024, police officers were dispatched to the respondent's residence in response to an altercation between the respondent and the father's mother.

---

[8] The trial court noted that, on August 27, 2023, the father was "again" charged with violation of a protective order, but that the "circumstances of this violation are unclear."

Finding the father present, despite the full no-contact order, the officers arrested the father. As a result of these events, the department concluded that, despite the respondent's claims otherwise, the respondent was sharing her apartment with the father.

Jessica Biren Caverly, a psychologist, evaluated the respondent and submitted a report to the court on April 4, 2024. The court credited the testimony of Caverly, who conducted interviews and psychological testing of both parents and observed visitation sessions between the respondent and the children. Caverly recommended that the respondent's rights to J be terminated, based on several factors, "including but not limited to the [respondent's] failure to acknowledge [intimate partner violence] and to follow through with [intimate partner violence] services and counseling; her inconsistent and deficient engagement in mental health treatment; her unwillingness to be forthcoming with providers and the department regarding several issues, including her relationship with the father and her pregnancies with [her other children]; and her inability to recognize the danger that the father posed to the children given the prior substantiations of allegations that he sexually abused minors, his poor decision-making, and his purported criminal behavior. During the interview, [Caverly] was alarmed that the [respondent] expressed that she did not believe that the father needed to be supervised with the children despite the numerous allegations that he sexually assaulted minors, including minors who are related to him. [Caverly] stated overall that she had concerns about the respondent being in a parenting role. . . . [Caverly] further expressed that, although the respondent and her children are familiar with each other, there was no evidence that they were bonded."[9]

---

[9] We note that Caverly reviewed Balducci's psychological evaluation reports from 2020 and 2023, in preparing her April, 2024 report. In addition, Caverly discussed the respondent's mental health treatment with two of the

In April, 2024, Eleanor Buchanan, a department social worker, filed an addendum to the social study in support of the termination of parental rights. The addendum to the social study stated that, since the filing of the petition for termination of parental rights, the respondent had given birth to her fifth child despite having denied her pregnancy to the department. Buchanan also reported that the respondent had been refusing to provide the petitioner with her address and had "consistently refused to sign releases for the [d]epartment to obtain provider updates on a regular basis." Most recently, Buchanan reported that, on April 4, 2024, she had met with the respondent during a supervised visit with the respondent's youngest child and the respondent had refused to sign releases.[10]

The respondent filed a motion for posttermination visitation on May 10, 2024. Trial on the petition for termination of parental rights, as well as the motion for posttermination visitation, was held on May 13, 2024, and lasted a single day. The petitioner called Caverly, Traylor, and Buchanan and introduced numerous exhibits.[11] The respondent also testified.

---

respondent's providers, Claire Utz and Diane Dodge. Caverly also consulted with Melanie Vitelli regarding the respondent's participation in 'r Kids Family Center's therapeutic family time program.

[10] Buchanan testified at trial as to these events, noting specifically that the department had referred the respondent to the Yale Child Study Center in an attempt to address the issue of intimate partner violence. Buchanan further testified that, despite having engaged with that program, the respondent had failed to sign a release allowing the department to communicate with that provider.

[11] The exhibits accepted into evidence included: (1) the father's specific steps filed September 20, 2022; (2) the respondent's specific steps filed September 20, 2022; (3) Traylor's social study dated August 10, 2023; (4) a social study addendum authored by Buchanan, dated April 25, 2024; (5) a permanency plan study filed December 28, 2022; (6) a permanency plan study addendum filed May 19, 2023; (7) a study filed in support of the neglect petition filed July 14, 2022; (8) a social worker affidavit filed June 17, 2023; (9) a study filed in support of the neglect petition filed March 27, 2024; (10) a parenting/psychological evaluation filed April 5, 2024; (11) Caverly's curriculum vitae; (12) the respondent's certified criminal history; and (13) the father's certified criminal history. The court also took judicial notice of

On July 5, 2024, the court issued its memorandum of decision, granting the petition to terminate the parental rights of the respondent and denying her motion for posttermination visitation with J.[12] The court found that the respondent was not fully cooperating with the department, having refused to sign a release to enable the department to get updated information and to permit the department to conduct home visits, and having failed to provide proof of employment. The court noted that the respondent's most recent therapist had offered

the record of the various child protection proceedings regarding all three children that were the subject of the trial.

[12] We note that " '[p]roceedings to terminate parental rights are governed by [General Statutes] § 17a-112. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun.' . . . Section 17a-112 (j) provides in relevant part that '[t]he Superior Court, upon notice and hearing . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the [d]epartment . . . has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . .' " (Citation omitted.) *In re Niya B.*, 223 Conn. App. 471, 487–88, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024). "Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Internal quotation marks omitted.) Id., 476 n.5.

to include in her treatment a component regarding intimate partner violence, but that the respondent "demurred, claiming she was not a victim of domestic violence." Further, the court found that the department "has made reasonable efforts to reunify the respondent with the children . . . . Notwithstanding the department's attempt to support and assist the [respondent], the [respondent] refused to open her eyes to the reality of her situation. She rebuffed assistance from mental health providers by refusing to discuss the father or [intimate partner violence]. She forfeited her chance at potentially reunifying with the children after completing [the therapeutic family time program] because of her unwillingness to truly engage in mental health treatment and her choice to remain with the father despite his conduct and history. Additionally, the [respondent] is unable and/or unwilling to benefit from reunification efforts."[13] The court further found that J, being three years old, needed "a reliable and attentive caregiver who can attend to [her] needs and keep [her] safe. [She has] been in the care of the department for a relatively lengthy period of time . . . . [She needs] permanency. Given the totality of the circumstances, including the [respondent's] history and the minimal progress she has made over the years, the [respondent] has failed

---

[13] We note that the court's memorandum of decision makes clear that, "[a]ccording to testimony, [Balducci] conducted a second evaluation of the [respondent] in January, 2023, and proposed that reunification of the children with the [respondent] 'appears possible' because testing of the [respondent] no longer indicated clinical concerns for depression or anxiety and the respondent's emotional regulation and behavior control capabilities had improved. The court gives little weight to this assessment as [Balducci] did not testify at trial, nor were any of his reports offered into evidence. As such, the court has no context for this opinion." We note, as well, that Balducci reported that the respondent described her relationship with the father as "supportive" but that he did not evaluate the father and, as a result, left open the question of what role the father would play in the children's lives "and as a support, or detriment" to the respondent. This conclusion came at the end of the paragraph that began with "[r]eunification appears possible."

to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of [J], she could assume a responsible position in [her life].” The court further found that, given the totality of the circumstances, the petitioner had proven, by clear and convincing evidence, that it was in the best interest of J to terminate the respondent’s parental rights pursuant to General Statutes § 17a-112 (k).[14] This appeal followed.

The respondent’s sole claim, raised for the first time on appeal, is that she did not receive the effective assistance of counsel in opposing the petition to terminate her parental rights and advocating for her motion for

[14] General Statutes § 17a-112 (k) provides: “Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child’s parents, any guardian of such child’s person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent’s circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.” We note that the respondent has not challenged any of the factual findings by the court.

posttermination visitation because her trial counsel failed to call Balducci as a witness. The petitioner argues that the respondent did not create a record sufficient to support the claim of ineffective assistance of counsel because there is no record of the reasons why counsel elected not to call Balducci as a witness— leaving open the possibility that such a decision was a reasonable trial strategy. Further, the petitioner argues that the record is silent as to whether Balducci would have continued to opine that reunification was possible in light of the respondent's "many violations of her specific steps" *after* Balducci's 2023 evaluation. According to the petitioner, potential avenues existed for the respondent to create a sufficient record for appellate review, but the respondent did not pursue those avenues. We agree with the petitioner that the record is inadequate for us to review the respondent's claim.

We next set forth the principles that guide our review. "In Connecticut, a parent who faces the termination of his or her parental rights is entitled, by statute, to the assistance of counsel."[15] *In re Alexander V.*, 223 Conn.

---

[15] General Statutes § 45a-717 (b) provides: "If a respondent parent appears without counsel, the court shall inform such respondent parent of his or her right to counsel and upon request, if he or she is unable to pay for counsel, shall appoint counsel to represent such respondent parent. No respondent parent may waive counsel unless the court has first explained the nature and meaning of a petition for the termination of parental rights. Unless the appointment of counsel is required under section 46b-136, the court may appoint counsel to represent or appear on behalf of any child in a hearing held under this section to speak on behalf of the best interests of the child. If the respondent parent is unable to pay for his or her own counsel or if the child is unable to pay for the child's counsel, in the case of a Superior Court matter, the reasonable compensation of counsel appointed for the respondent parent or the child shall be established by, and paid from funds appropriated to, the Judicial Department and, in the case of a Probate Court matter, the reasonable compensation of counsel appointed for the respondent parent or the child shall be established by, and paid from funds appropriated to, the Judicial Department, however, in the case of a Probate Court matter, if funds have not been included in the budget of the Judicial Department for such purposes, such compensation

557, 569, 613 A.2d 780 (1992). Consistent with that statutory right, our Supreme Court has held that a parent facing such proceedings has the right to the effective assistance of counsel. See *State* v. *Anonymous*, 179 Conn. 155, 160, 425 A.2d 939 (1979); *In re Danyellah S.-C.*, 167 Conn. App. 556, 567, 143 A.3d 698, cert. denied, 323 Conn. 913, 150 A.3d 228 (2016). "Moreover, a parent whose rights have been terminated may assert, on direct appeal, that he or she was deprived of the right to the effective assistance of counsel at trial. . . . [I]t is the responsibility of the respondent to demonstrate trial counsel's ineffectiveness by reference to the record and not merely by allegation." (Citations omitted.) *In re Peter L.*, 158 Conn. App. 556, 563–64, 119 A.3d 23 (2015).

As we have recently reiterated, we evaluate counsel's performance in a termination proceeding under the following two-pronged standard: "The range of competence . . . requires not errorless counsel, and not counsel judged ineffective by hindsight, but counsel whose performance is reasonably competent, or within the range of competence displayed by lawyers with ordinary training and skill in [that particular area of the] law. . . . A showing of incompetency without a showing of resulting prejudice . . . does not amount to ineffective assistance of counsel. . . . In making such a claim, it is the responsibility of the respondent to create an adequate record pointing to the alleged ineffectiveness and any prejudice the respondent claims resulted from that ineffectiveness. . . . In the absence of findings by the trial court in this regard, we directly review the trial court record. . . . We are mindful that a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects

shall be established by the Probate Court Administrator and paid from the Probate Court Administration Fund."

of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that [the] conduct [of trial counsel] falls within the wide range of reasonable professional assistance; that is, [an appellant] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Citations omitted; internal quotation marks omitted.) *In re Wendy G.-R.*, 225 Conn. App. 194, 204–205, 314 A.3d 1029, cert. denied, 349 Conn. 916, 316 A.3d 357 (2024).

In *In re Wendy G.-R.*, we considered the claim, raised for the first time on direct appeal, that the respondent mother's counsel had rendered ineffective assistance during a termination of parental rights trial. That claim was centered on the fact that the respondent mother's counsel did not object, after the presentation of evidence, to a motion by counsel for the petitioner to amend the petition seeking termination of parental rights. The respondent mother argued that " 'no reasonable attorney' " would have failed to object to such a motion and that there was no possible way to construe trial counsel's inaction as anything but deficient. Id., 203. The respondent mother also argued that there could be "no dispute" that she was prejudiced by her counsel's deficient performance because, without the amendment to the petition, her parental rights would not have been terminated. Id. We determined that the respondent mother could not satisfy her burden. Id., 211. In so concluding, we noted that, in order to satisfy the respondent mother's burden of proving that counsel had rendered deficient representation, a party "must do more than demonstrate that counsel failed to object to the motion to amend. Instead, she must demonstrate that counsel's failure to object cannot be explained by

one or more possible strategic reasons that are objectively reasonable." Id. We noted that "the record [was] bereft of any evidence of the *actual* strategy, if any, that the [respondent mother's] counsel employed when she did not object [to the motion to amend]." (Emphasis in original.) Id., 208.

The lack of an adequate record is an inherent pitfall in any direct appeal of a termination judgment that alleges ineffective assistance of counsel. See *In re Jonathan M.*, 255 Conn. 208, 235, 764 A.2d 739 (2001) ("[i]n a case such as this, wherein a parent alleges ineffective assistance of counsel at the termination trial, the record may not contain the factual predicates sufficient to review, on direct appeal, the appointed attorney's adequacy") As our Supreme Court in *In re Jonathan M.* has observed, and, as we also discussed in *In re Wendy G.-R.*, there are, however, possible avenues by which a parent whose parental rights have been terminated can develop an adequate record: "General Statutes § 45a-719 provides a number of alternatives through which a party may attempt to open the final judgment of termination and assert a claim of ineffective assistance of counsel. The first option permits a motion to open the judgment in accordance with General Statutes § 52-212 or General Statutes § 52-212a. These provisions allow a four month window from the date of judgment within which such a motion may be brought. Second, the principles governing the opening of judgments at common law may also provide an indigent parent a means of gaining a review of the adequacy of trial counsel at the termination proceeding. It is a well-established general rule that even a judgment rendered by the court . . . can subsequently be opened [after the four month limitation] . . . if it is shown that . . . the judgment . . . was obtained by fraud . . . or because of mutual mistake. . . . Thus, when a judgment of termination

is predicated on fraud or mutual mistake and the indigent's appointed counsel fails to address these issues, presumably rendering the assistance ineffective, the parent may have a remedy to open the judgment at common law. . . . [A] parent may [also] file a petition for a new trial. See General Statutes § 52-582. Under this option, a parent whose rights have been terminated has three years within which to file a petition. General Statutes § 52-270 provides that the court may grant such a petition for reasonable cause. . . . Finally, we recognize that § 45a-719 . . . limits all of the available options by precluding the court from granting any motion or petition filed after a final decree of adoption has *been entered.*" (Citations omitted; emphasis added; footnotes omitted; internal quotation marks omitted.) *In re Jonathan M.*, supra, 255 Conn. 236–40; see also *In re Wendy G.-R.*, supra, 225 Conn. App. 205 ("the respondent had an opportunity to develop a factual record related to counsel's allegedly deficient performance and any resulting prejudice").[16]

---

[16] We note that the petitioner's counsel, in oral argument to this court, conceded that § 45a-719 allows a parent who alleges ineffectiveness of counsel at a trial terminating his or her parental rights to petition for a new trial on that basis.

General Statutes § 45a-719 provides: "The court may grant a motion to open or set aside a judgment terminating parental rights pursuant to section 52-212 or 52-212a or pursuant to common law or may grant a petition for a new trial on the issue of the termination of parental rights, provided the court shall consider the best interest of the child, except that no such motion or petition may be granted if a final decree of adoption has been issued prior to the filing of any such motion or petition. Any person who has legal custody of the child or who has physical custody of the child pursuant to an agreement, including an agreement with the Department of Children and Families or a licensed child-placing agency, may provide evidence to the court concerning the best interest of the child at any hearing held on the motion to reopen or set aside a judgment terminating parental rights. For the purpose of this section, 'best interest of the child' shall include, but not be limited to, a consideration of the age of the child, the nature of the relationship of the child with the caretaker of the child, the length of time the child has been in the custody of the caretaker, the nature of the relationship of the child with the birth parent, the length of time the child has been in the custody of the birth parent, any relationship that may exist between

Under the circumstances presented by this case, we conclude that the record before us is inadequate to review the respondent's claim that counsel rendered ineffective assistance by failing to call Balducci as a witness. We note that, at oral argument before this court, the respondent's counsel conceded that it would be "speculative" to guess as to what Balducci may have concluded, if presented with evidence of the events that transpired between the date of his report and the termination hearing, because there is "no way to know" how these events—including the April, 2023 incident in which the father brandished a firearm during a conflict with the respondent, as well as the respondent's ongoing relationship with the father—would have shaped Balducci's conclusion as to whether reunification efforts were likely to be successful. Similarly, the record is devoid of any explanation as to why trial counsel decided not to call Balducci—including whether he was available and willing to testify at the termination hearing. See *In re Alexander V.*, supra, 223 Conn. 571 ("[a]lthough we acknowledge the possibility that counsel could, under some circumstances, be deemed ineffective for failure to make an adequate trial record of an important legal issue, we are, as an appellate court, limited to the record presented to us in deciding the merits of an appeal"); *Banks* v. *Commissioner of* Correction, 225 Conn. App. 234, 244, 314 A.3d 1052

the child and siblings or other children in the caretaker's household, and the psychological and medical needs of the child. The determination of the best interest of the child shall not be based on a consideration of the socioeconomic status of the birth parent or the caretaker." See also *In re Jonathan M.*, supra, 255 Conn. 238–39 (discussing available avenues to develop factual record, including, "as the department concedes, a parent may file a petition for a new trial"); *In re Shanice P.*, Superior Court, judicial district of Middlesex, Child Protection Session at Middletown, Docket No. JV-97-0006404-S (October 6, 2000) (28 Conn. L. Rptr. 284, 286) ("[w]here a new trial is sought in a proceeding to terminate parental rights, the legislature has decreed [through § 45a-719] that the court must also consider the best interests of the child"), appeal dismissed, 64 Conn. App. 78, 779 A.2d 151 (2001).

("[t]he trial transcript seldom discloses all of the considerations of strategy that may have induced counsel to follow a particular course of action" (internal quotation marks omitted)), cert. denied, 349 Conn. 922, 321 A.3d 1130 (2024); *Harris* v. *Commissioner of Correction*, 134 Conn. App. 44, 57, 37 A.3d 802 ("[t]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense" (internal quotation marks omitted)), cert. denied, 304 Conn. 919, 41 A.3d 306 (2012). In sum, the respondent has failed to present us with a sufficient record to overcome the strong presumption that the decision not to call Balducci was strategically sound.[17]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[17] This logic applies equally to the respondent's claim that counsel's failure to call Balducci contributed to the denial of the respondent's motion for posttermination visitation.